UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

<div style="border">
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/25/2022
</div>

E.L. and D.P., on behalf of J.P.,

                    Plaintiffs,

    -against-

BEDFORD CENTRAL SCHOOL DISTRICT,

                    Defendant.

No. 18 Civ. 3062 (NSR)

**OPINION & ORDER**

NELSON S. ROMÁN, United States District Judge

Plaintiffs E.L. and D.P., on behalf of their son J.P., bring this action against the Bedford Central School District ("Defendant" or "the School District") pursuant to the Individuals with Disabilities Education Improvement Act ("IDEA" or "IDEIA"), 20 U.S.C. § 1400 *et seq.*, and Section 504 of the Rehabilitation Act of 1973 ("RA"), 29 U.S.C. § 794 ("Section 504"). Plaintiffs seek, *inter alia*, judicial review of a decision made by a State Review Officer ("SRO") at the New York State Department of Education, who affirmed in part the decision of an Impartial Hearing Officer ("IHO"). The SRO decision found child find violations by the School District but found no relief was requested, denied Plaintiffs' request for tuition reimbursement and other expenses associated with a private school placement after finding that the School District offered J.P. a free and appropriate public education for a portion of the 2015–2016 school year and for the 2016–2017 school year, and denied Plaintiffs' request for reimbursement of tutoring fees for the period between September 2014 and January 2016. Plaintiffs also allege that the School District's treatment of J.P. violated the RA and ask the Court to reverse the finding of the IHO that there were no Section 504 violations.[1]

---

[1] The SRO lacked jurisdiction to consider Plaintiffs' challenge to IHO's denial of their Section 504. (*See* SRO Decision at 10.)

Before the Court is Plaintiffs' motion for summary judgment.  (ECF No. 17.)  For the reasons set forth below, Plaintiffs' motion is DENIED.  The SRO's decision is AFFIRMED. Plaintiff's claims asserted against the School District pursuant to the RA are DISMISSED.

## BACKGROUND

### I.    Factual Background

The parties have submitted briefs, statements of material facts pursuant to Local Civil Rule 56.1, and the record and exhibits from the proceedings below,[2] which reflect the following factual background.[3]

### A.    Plaintiffs' Due Process Complaint

J.P. was a student at Pound Ridge Elementary School ("PRES") in Pound Ridge, New York, within the Bedford Central School District.  (Def. 56.1 at 5.)  Plaintiffs, on behalf of their disabled child J.P., filed a Due Process Complaint, also known as an Impartial Hearing Demand, against the School District on or about December 23, 2016.  (Pls. 56.1 ¶ 1; *see* Decision of IHO Kenneth S. Ritzenberg ("IHO Decision"), August 31, 2017 at 1.)  Plaintiffs cited claims under New York State Education Law § 4404 and regulations promulgated therefor at 8 NYCRR § 200.5, as well as federal claims under the IDEA, the Americans with Disabilities Act ("ADA"), the Civil Rights Act, and Section 504 of the RA.  (C.R. Ex. D-1 at 5.)  Plaintiffs requested an impartial hearing on whether J.P.'s 2015–2016 and 2016–2017 school years' Individualized Education

---

[2] Plaintiffs' motion for summary judgment was fully briefed as of November 9, 2018.  (*See* Pls. Mot. Summ. J. ("Pls. Mot."), ECF No. 17; Pls. Rule 56.1 Statement ("Pls. 56.1"), ECF No. 18; Def. Counter Statement to Pls. 56.1 ("Def. 56.1"), ECF No. 20; Def. Opp'n to Pls. Mot. ("Def. Opp."), ECF No. 19; Pls. Mem. in Reply to Def. Opp'n ("Pls. Reply"), ECF No. 21.)  A certified hard copy of the administrative hearing record that was before the State Review Officer (the "Certified Record") was received by the Court by mail on June 12, 2018.  The Certified Record was not e-filed.

[3] For ease of reference, citations prefixed by "C.R." refer to the Certified Record before the Court containing the relevant exhibit or hearing testimony from the certified transcript.  Referenced exhibits prefixed by "D-" refer to the School District's exhibits and those prefixed by "P-" refer to Plaintiffs' exhibits introduced at the impartial hearing. Exhibits introduced by the IHO are prefixed with "IHO Ex."  Hearing testimony is followed by the witness's last name.

Programs ("IEP") were inappropriate and failed to offer a free and appropriate public education ("FAPE"), whether the School District failed to identify J.P. as a child with a disability in violation of its child find violations under IDEA, and for reimbursement of tuition, room and board, and transportation to Plaintiffs' unilateral placement of J.P. at Winston Preparatory School ("WPS") in Norwalk, Connecticut during part of the 2015–2016 school year and the 2016–2017 school year. (*Id.* at 6–7.)

Plaintiffs aver that the School District did not interpose an answer to their Due Process Complaint. (Pls. 56.1 ¶ 2.) Defendant denies this allegation and further avers that the School District relied on Prior Written Notices it had supplied to the parents with the proposed education plans as permitted under statute. (Def. 56.1 ¶¶ 2 & 2 n.2.) Plaintiffs did not raise the issue of the School District's answer or lack thereof, or of their newly alleged failure to receive Prior Written Notices, (Pls. 56.1 ¶ 2 n.2), before or during the impartial hearing.

## B. Record Adduced at Hearing before the IHO

An impartial hearing before an IHO was held to determine the merits of Plaintiffs' claims, including the appropriateness of the IEPs provided by the School District. The impartial hearing lasted for five days over a period of about two weeks, beginning on May 30, 2017, and ending on June 9, 2017. (*See* IHO Decision at 1–2.) Plaintiffs were represented by counsel at the hearing. (*Id.*) Eight witnesses testified during the hearing: Dr. Edward Escobar, the School District's director of pupil services and interim director of special education; Corrine Videla, an elementary learning specialist; Jennifer Corcoran, a school psychologist; Randal Lichtenwalner, principal of Pound Ridge Elementary School; Toni Ann Carey, the district coordinator of elementary special education; Danielle Hawaux, a teacher at Winston Preparatory School; Dr. Jeanne Dietrich, a

psychologist engaged by Plaintiffs ("Dr. Dietrich"); and Plaintiff E.L., J.P.'s mother.[4]  (*See* C.R.) The Court summarizes the salient portions of the documentary and testimonial evidence below, referring to the IHO's summary and specific record citations as needed.

### 1.  2012–2013 and 2013–2014: First and Second Grade

J.P. was a student at PRES, a school within the School District, until his parents placed him in an alternative program at WPS for a portion of his fourth-grade year and for his fifth-grade year.[5]  (Pls. 56.1 ¶¶ 14, 17; C.R. 314, 317 (E.L.).)  J.P.'s struggles with reading and writing were allegedly first noticed by the School District in 2013, at the end of his first-grade year, when J.P.'s first-grade teacher informed E.L. that "J might be suffering from dyslexia." (C.R. 317–18 (E.L.).) At the beginning of J.P.'s second-grade year, E.L. expressed concerns to J.P.'s second-grade teacher that he might have a form of dyslexia and received notice that J.P. had begun receiving educational support services in the form of Response To Intervention ("RTI") services to assist with his reading.[6]  (C.R. Ex. at P-P at 1; C.R. 318 (E.L.); C.R. 196 (Lichtenwalner).)

During J.P.'s second-grade year, Plaintiffs became concerned about the lack of improvement they observed in J.P.'s academic performance.  (C.R. 319 (E.L.).)  Plaintiffs retained a tutor outside of school to assist J.P. with his reading and literacy.  (C.R. 316–17 (E.L.).)  In March 2014, they obtained a private psychoeducational evaluation of J.P.  (*Id.* at 319 (E.L.); *see*

---

[4]  The transcripts of the testimony alone constituted over 500 pages.  Additionally, numerous exhibits were presented by the parties and received into evidence.

[5]  Plaintiffs inform the Court that J.P. now attends the Harvey School, in Katonah, New York.  (Pls. 56.1 ¶ 13.)

[6]  RTI services were described as comprising three tiers based on the individual needs of the student.  (C.R. 18–19 (Escobar).)  Tier 1 is generally provided by a classroom teacher and typically occurs only in the classroom. (*Id.* at 19 (Escobar).)  If Tier 1 is unsuccessful after a period of 6–8 weeks, Tier 2 interventions, whereby a particular person is assigned to work with a struggling student in a smaller group setting for a more finite period of time, would be introduced.  (*Id.* at 20 (Escobar).)  Tier 3 is similar to Tier 2, though it is typically more intensive.  (*Id.*)  In accordance with these parameters, during his second-grade year, J.P. received Tier 1 and 2 services.  (C.R. 43; 477 (Mirenberg).)

C.R. Ex. D-2.)  The evaluation was conducted on March 12 and 27, 2014 by Dr. Anjali Roye, a psychologist at the Developmental Assessment & Intervention Center.  (C.R. Ex. D-2 at 1, 15.) Dr. Roye diagnosed J.P. with a "specific learning disability with impairments in reading rate, accuracy."  (*Id.* at 13.)  She also provided "a rule out of attention-deficit/hyperactivity disorder— primarily inattentive type," and recommended monitoring of J.P.'s attention/executive functioning skills.  (*Id.* at 11.)  Dr. Roye observed that while J.P. possessed strong nonverbal reasoning skills, his visual processing skills were poor, making reading, and to some extent writing, more difficult tasks for J.P.  (*Id.* at 12–13.)  She also opined that "[a]cross domains, [J.P.'s] processing speed was an area of weakness in his profile."  (*Id.* at 12.)

Dr. Roye included in her evaluation a series of recommendations regarding J.P.'s education programming.  (*Id.* at 13–15.)  She noted that Plaintiffs "m[ight] wish to share this evaluation with [J.P.'s] school district's Committee on Special Education, to determine if he would qualify for a classification as a student with a learning disability."  (*Id.* at 13.)  Plaintiffs did not share Dr. Roye's report with the School District until the start of J.P.'s third-grade year.  (Pls. 56.1 ¶ 42; Def. 56.1 at 14.)

### 2.  *2014–2015: Third Grade*

As J.P. began third grade, the School District observed that he was still experiencing educational difficulties, and that based on the results of a universal screening examination given to students, J.P. now qualified for Tier 2 RTI services.  (C.R. 196 (Lichtenwalner).)  J.P. received Tier 2 RTI services for parts of his third-grade year, but after surpassing the performance benchmark for that level of RTI services, was restored to Tier 1 RTI services.[7]  (*Id.* 196–97 (Lichtenwalner).)

---

[7] RTI services are typically provided on a six- to eight-week cycle, after which a review is conducted by the school's RTI team to ascertain whether a student needs additional or fewer services.  (C.R. 19–21 (Escobar).)

In September 2014, Plaintiffs provided a copy of Dr. Roye's March 2014 evaluation to J.P.'s teacher and then-principal of PRES, Timothy Gembka. (C.R. Ex. P-Q at 1.) At a meeting with E.L., J.P.'s third-grade teacher, and Principal Gembka, E.L. recalled Principal Gembka assured her that J.P.'s placement in a co-teach class and the provision of regular reading assistance sessions would be sufficient to enable J.P. to succeed in third grade. (C.R. 320–21 (E.L.).) Neither Plaintiffs nor any School District personnel made a referral to the Committee on Special Education ("CSE"), as recommended by Dr. Roye.

### 3.   *2015–2016: Fourth Grade*

J.P. began his fourth-grade year enrolled at PRES. Because of his poor performance on the statewide English Language Arts ("ELA") examination administered during third grade, J.P. was placed again in Tier 2 level RTI services. (C.R. 192, 197 (Lichtenwalner); C.R. 324 (E.L.).) At the beginning of the school year, E.L. sought out and met with J.P.'s fourth grade teacher and the new PRES principal, Randal Lichtenwalner, to discuss J.P.'s academic needs and challenges. (C.R. 197 (Lichtenwalner); C.R. 324–27 (E.L.).) At the meeting in early October 2015, Principal Lichtenwalner explained to E.L. the differences between a plan developed pursuant to Section 504 of the RA and an IEP prepared by CSE. (C.R. 199 (Lichtenwalner); C.R. 326–27 (E.L.).) Plaintiffs referred J.P. to CSE for evaluation to ascertain whether he would be eligible for an IEP shortly after the meeting, on October 20, 2015. (C.R. 199–200 (Lichtenwalner); C.R. 327 (E.L.); C.R. Ex. D-17.)

### a.   *Evaluation of J.P. in December 2015*

In December 2015, the School District conducted a classroom observation, prepared a social history, and conducted initial education, occupational therapy ("OT"), and speech-language evaluations of J.P. (*See* C.R. Exs. D-3, D-4, D-5, D-6, D-7.) Plaintiffs obtained a second private

psychological evaluation by Dr. Jean Dietrich, a clinical psychologist. (*See* C.R. Ex. D-8.) The following briefly summarizes the relevant results of the foregoing reports and evaluations.

J.P.'s speech-language evaluation was completed on December 3, 2015. (C.R. Ex. D-3.) The evaluation was conducted by Allyson Mahoney, a speech-language pathologist. (*Id.*) Mahoney determined that J.P. was in the above-average range of language functioning. (*Id.*)

The classroom observation was performed by Kathleen Finn, a school psychologist ("Dr. Finn"), on December 21, 2015, to analyze J.P.'s receptiveness in the classroom. (C.R. Ex. D-5.) Dr. Finn observed that J.P. was "able to be attentive when engaged in subjects of high/interest that match his ability level (e.g., math and science)." (*Id.* at 2.) However, J.P. became "internally distracted during less preferred/ academically challenging activities (e.g., reading and writing)." (*Id.*)

J.P.'s OT evaluation was also completed on December 21, 2015. (C.R. Ex. D-4.) Evaluator Jaime Lowery stated that J.P. performed some functions within an average range of his peers. (*Id.*) However, Lowery opined that J.P. completed tasks requiring fine motor integration, manual dexterity, and visual motor integration within the below average range. (*Id.*)

J.P.'s initial educational evaluation ("IEE") was completed on December 22, 2015. (C.R. Ex. D-7.) It was administered by Nicole Gillespie, a special education learning specialist. (*Id.*) As part of the IEE, J.P. was administered the Wechsler Individual Achievement Test, Third Edition ("WIAT-III"), a diagnostic educational achievement test ranking the test taker against students of identical age or grade. (*Id.* at 2.) On the WIAT-III achievement tests of oral language, written language, math fluency, basic reading, and total reading, J.P. scored within the average range. (*Id.*) On the math composite achievement test, J.P. scored in the above average range. (*Id.*) J.P. scored in the below average range on the oral discourse comprehension subtest of the oral language

composite achievement test.  (*Id.* at 5.)

J.P.'s confidential social history report was completed on December 22, 2015.  (C.R. Ex. D-6.)  The report was prepared by Dr. Finn.  (*Id.*)  Dr. Finn opined that D.P., J.P.'s father, served as the source of information for J.P.'s social history.  (*Id.*)  She described J.P. in her report as "a happy, socially appropriate boy with good frustration tolerance."  (*Id.*)  There was no mention of bullying or difficulties interacting with peers in Dr. Finn's report.

On December 9, 14, and 28, 2015, Plaintiffs had J.P. evaluated by Dr. Dietrich, who is experienced in the use of psychological tests for the evaluation of learning disability and attentional issues.  (C.R. Ex. P-V.)  Dr. Dietrich conducted a battery of tests, including the WIAT-III, assessing, *inter alia*, J.P.'s levels of verbal functioning, non-verbal functioning, memory, attention, and academic testing.  (*Id.* at 17–25.)  Ultimately, Dr. Dietrich concluded that although J.P.'s "current intellectual status . . . is within the upper end of the Average range," J.P. "presents with weak oral reading fluency and deficits in written language," as well as dysgraphia.  (*Id.* at 17.)  Dr. Dietrich noted, *inter alia*, that J.P. would benefit from "intensive remedial intervention," including an OT evaluation, time-and-a-half for testing in a separate location, writing interventions, oral discussion on assignments when given, speech-to-text software, interspersed breaks during lessons, clarification of task demands, internalization of self-monitoring behavior, and explicit instructions for organizational skills.  (*Id.* at 26–28.)  Finally, Dr. Dietrich diagnosed J.P. with a "specific learning disorder with impairment in reading (Dyslexia)," a "specific learning disorder with impairment in written expression," and "Attention Deficit Disorder."  (*Id.* at 26.)

### b.  *January 2016 CSE Meeting and Plaintiffs' Rejection of IEP*

A CSE meeting was held on January 14, 2016, to assess J.P.'s entitlement to special education services based on a potential classification of a learning disability.  (C.R. Ex. D-9.)  The

participants at the CSE meeting included Plaintiffs and their attorney; CSE Chairperson, Roni Kramer; Department Coordinator for Elementary Special Education, Toni Ann Carey; J.P.'s fourth grade teacher, Jessica Crupi; Dr. Finn; Ms. Gillespie; Ms. Mahoney; and Mr. Lowery; and the School District's attorney. (*Id.*) The CSE reviewed all data available to them, including the reports and evaluations prepared by District personnel and Dr. Dietrich's outside evaluation. (*See id.*) As a result of the meeting, the CSE classified J.P. as learning disabled and recommended an IEP which provided for, *inter alia*, resource room services in forty-five-minute intervals four times per week, access to voice-to-text software when completing written assignments, extra time to complete written assignments and long-term projects, three-minute classroom breaks every twenty minutes, modified homework assignments, and monthly OT consultations. (*Id.*)

On February 3, 2016, Plaintiff E.L. advised the CSE that she would not consent to the initial provision of the special education services in the recommended IEP. (C.R. Ex. D-10.) By letter dated February 11, 2016, Plaintiffs rejected the IEP as inadequate and advised they had decided to enroll J.P. at WPS beginning on March 7, 2016. (C.R. Ex. D-11.) Plaintiffs noted that they reserved the right to seek tuition reimbursement and transportation related to J.P.'s attendance at WPS at public expense. (*Id.*)

Plaintiffs also cited their concerns that J.P. was experiencing bullying as influencing their decision to place J.P. in a private school outside of the school district. (*Id.*; *see* C.R. 347–48 (E.L.).) Plaintiffs stated J.P. was hit and punched in the stomach, and had his fingers pulled back by other children on two occasions, which were never reported to the school. (C.R. 348–49 (E.L.).) Plaintiffs also stated they received notice from Lichtenwalner and his predecessor about three incidents on the school bus and during recess. (*Id.*) The first incident involved a girl on the bus allegedly threatening to shoot J.P. with a BB gun during an unspecified school year. (*Id.*) The

second incident took place in January 2016, also on the bus, and involved J.P. hitting the same girl after she kicked him in the chin.  (*See id.* 349 (E.L.); C.R. 214 (Lichtenwalner); C.R. Ex. P-E.) The third incident took place in February 2016, during recess, when J.P. hit a girl in the face with a ball after she hit him in the face.  (*See* C.R. 349 (E.L.; C.R. 204 (Lichtenwalner).)  Lichtenwalner investigated the two physical altercations that occurred in January and February 2016.  (C.R. 200– 10 (Lichtenwalner).)  Ultimately, as recounted in his email to E.L. dated February 15, 2016, Lichtenwalner determined that, although his investigation revealed that all children involved, including J.P., engaged in inappropriate behavior, he did not find any evidence that J.P. was being bullied or otherwise targeted because of his learning disability.  (C.R. Ex. P-E.)  Rather, the two 2016 incidents came about because of "mutual disagreements."  (*Id.*)

Plaintiffs unilaterally withdrew J.P. from PRES and enrolled him at WPS on March 7, 2016.  (Pls. 56.1 ¶ 81.)  He completed his fourth-grade school year at WPS.  (*See id.* at 13–17.)

### 4.  *2016–2017: Fifth Grade*

#### a.  *July 2016 CSE Meeting and Plaintiffs' Rejection of IEP*

On July 18, 2016, the CSE convened for J.P.'s annual review and to develop an IEP for the 2016–2017 school year.  (C.R. Ex. D-13.)  The participants at the CSE meeting included: CSE Chairperson, Toni Ann Carey; Director of Pupil Personnel Services, Edward Escobar; District's Attorney, Stephanie Roebuck; Special Education Teacher, Corinne Videla; Psychologist, Jennifer Corcoran; Speech/Language Specialist, Maureen Brown Warren; Occupational Therapist, Margaret Browning Barnikel; General Education Teacher, Marissa Bonitatibus (via phone); Parents' Attorney, Peter Hoffman; WPS Focus Teacher, Ella Gentile (via phone); WPS Dean, Jordan Yannotti; and J.P.'s parents, E.L. and D.P.  (*Id.*)  The CSE reviewed all prior private and District evaluations of J.P.  (*Id.*)  WPS reported on J.P.'s transition to their school and provided an

academic update.  (*Id.*)  WPS recommended J.P. required more study skills and organization goals, which CSE added to the IEP.  (*Id.*; C.R. 455 (Carey).)  In conferring with WPS, the CSE proposed reading comprehension and fluency goals.  (*Id.*)

The July 18, 2016 IEP recommended resource room five times per week for 45 minutes a day, monthly counseling consult to support J.P.'s social emotional needs, and OT consult.  (C.R. Ex. D-13.)  At the CSE meeting, Plaintiffs provided consent for the School District to conduct updated academic testing for J.P.  (*Id.*; C.R. 454 (Carey)).  Plaintiffs' attorney stated Plaintiffs would reject the IEP and retain their right to seek tuition reimbursement for J.P.'s placement.  (C.R. Ex. D-13.)

The School District performed tests on J.P. over the summer of 2016 utilizing the Woodcock-Johnson Academic Functioning Assessment ("Woodcock-Johnson") and the Test of Reading Comprehension ("TORC").  On the Woodcock-Johnson, J.P. scored in the average range on all reading scores except for the reading fluency, which was in the low range.  (C.R. 83; C.R. Ex. P-D.)  On TORC, J.P. scored below average.  J.P. scored in the average range on written language but received a low-average range for writing fluency.  J.P. scored in the average to above-average range for oral language and for mathematics, except for a subtest on math fluency which he received a low range.

On August 22, 2016, E.L. advised the School District in writing that J.P. would be placed at WPS for the 2016–2017 school year.  (C.R. Ex. D-14.)  On September 21, 2016, Plaintiffs advised the School District by letter the reasons they reject the IEP for the 2016–2017 school year. (C.R. Ex. D-15.)

### b.  *October 13 2016 CSE Meeting*

On October 13, 2016, the CSE reconvened to review the test scores from summer of 2016. (C.R. Ex. D-16.)  Participants at this CSE meeting included: CSE Chairperson, Edward Escobar; the School District's Attorney, Stephanie Roebuck; Special Education Teacher, Corinne Videla; Psychologist, Jennifer Corcoran; Speech/Language Specialist, Maureen Brown Warren; Occupational Therapist, Margaret Browning Barnikel; General Education Teacher, Jackie Guglielmo; WPS Focus Teacher, Danielle Hawaux (via teleconference); Plaintiffs' Attorney, Peter Hoffman; and Plaintiffs, E.L. and D.P.  (*Id.*)  The CSE reviewed the assessments and proposed the same resource room program, with changes made to the accommodations and goals to reflect the assessments.  (*Id.*; C.R. 90–91.)

### C.  IHO Decision

Following the impartial hearing held in May and June of 2017, the IHO issued a 27-page decision dated August 31, 2017, consisting of findings of fact and conclusions of law.  (*See generally* IHO Decision.)  The IHO denied Plaintiffs' application in its entirety.  (*Id.*)

With respect to Plaintiffs' claim that the School District violated its child find obligations, the IHO determined that the statute of limitations precluded Plaintiffs from raising claims that accrued prior to December 2014; therefore, the IHO found that the permissible period for Plaintiffs' child find claim was limited to December 2014 through October 2015.  (*Id.*)  Ultimately, the IHO concluded: (1) the School District did not violate its child find obligations prior to October 2015; (2) the School District offered J.P. a FAPE during the 2015–2016 and 2016–2017 school years; and (3) there was no evidence in the hearing record of discrimination, gross negligence, or reckless indifference to support Plaintiffs' Section 504 claim.  (*Id.*)

### D.  SRO Decision

Plaintiffs sought review of the IHO's decision, and, on December 8, 2017, the SRO affirmed in part the IHO decision.  The SRO reversed the IHO's finding that the School District complied with its child find obligations during the 2014–2015 school year and a portion of the 2015–2016 school year.  (*See* SRO Decision).  Since Plaintiffs did not request any relief with respect to the 2014–2015 school year, such as in the form of compensatory education, and did not request relief during the 2015–2016 school year until after J.P. was found eligible for an IEP and the child find violation had ended, the SRO did not award any monetary relief to Plaintiffs.  (*Id.*)

## II.     Procedural History

Plaintiffs filed their complaint in this matter on April 6, 2018.  (ECF No. 1.)  The School District filed its answer on June 5, 2018.  (ECF No. 11.)  Plaintiff's motion for summary judgment was fully submitted, with opposition from the School District, as of November 9, 2018.  (ECF Nos. 17–21.)

## LEGAL STANDARDS

## I.      Legal Framework of IDEA[8]

The IDEA's "purpose is 'to ensure that all children with disabilities have available to them a free appropriate public education.'"  *T.K. v. New York City Dep't of Educ.*, 810 F.3d 869, 875 (2d Cir. 2016) (quoting 20 U.S.C. § 1400(d)(1)(A)).  As the Second Circuit has recently described, this means "an education 'likely to produce progress, not regression,' and one that 'afford[s] the student with an opportunity greater than mere trivial advancement.'"  *Id.* (quoting *M.O. v. New York City Dep't of Educ.*, 793 F.3d 236, 239 (2d Cir. 2015)); *accord Endrew F. ex*

---

[8]  The IDEA was amended by the IDEIA in 2004.  *See E.M. v. New York City Dep't of Educ.*, 758 F.3d 442, 445 n.1 (2d Cir. 2014).

*rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 1001 (2017) ("a student offered an educational program providing 'merely more than *de minimis*' progress from year to year can hardly be said to have been offered an education at all").

"The 'centerpiece' of the IDEA and its principal mechanism for achieving this goal is the IEP." *T.K.*, 810 F.3d at 875. "The IEP is the means by which special education and related services are 'tailored to the unique needs' of a particular child." *Endrew F.*, 137 S. Ct. at 994 (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 181 (1982)). The IDEA imposes upon school districts the duty to seek out children with a disability and ensure they receive the special education services they need. *See* 20 U.S.C. § 1412(a)(3); 34 C.F.R. § 300.111(a)(1)(i); *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 245 (2009). Similarly, "an educational agency must issue an IEP for a resident qualifying child, even if that child has been enrolled in a private school outside the boundaries of the school district." *Doe v. E. Lyme Bd. of Educ.*, 790 F.3d 440, 451 (2d Cir. 2015). And, the IEP "must be drafted in compliance with a detailed set of procedures." *Endrew F.*, 137 S. Ct. at 994 (citing 20 U.S.C. § 1414(d)(1)(B)).

"The IDEA requires that every IEP include 'a statement of the child's present levels of academic achievement and functional performance,' describe 'how the child's disability affects the child's involvement and progress in the general education curriculum,' and set out 'measurable annual goals, including academic and functional goals,' along with a 'description of how the child's progress toward meeting' those goals will be gauged." *Id.* (quoting 20 U.S.C. §§ 1414(d)(1)(A)(i)(I)–(III)). It "must also describe the 'special education and related services . . . that will be provided' so that the child may 'advance appropriately toward attaining

the annual goals' and, when possible, 'be involved in and make progress in the general education curriculum.'" *Id.* (quoting 20 U.S.C. § 1414(d)(1)(A)(i)(IV)).

In addition to providing an education likely to produce progress, tailored to the unique needs of the child, the program must be offered in the least restrictive environment.  20 U.S.C. § 1412 (a)(5)(A); N.Y. Comp. Codes R. & Regs. §§ 200.1(cc), 200.6(a1); *see C.W.L. & E.L. v. Pelham Union Free Sch. Dist.*, 149 F. Supp. 3d 451, 467–68 (S.D.N.Y. 2015) (quoting *M.W. ex rel. S.W. v. New York City Dep't of Educ.*, 725 F.3d 131, 145 (2d Cir. 2013)) (one of the IDEA's goals is "to provide disabled children with a public education 'while protecting them from being inappropriately sequestered in a special-education classroom'").  "[A] disabled student's least restrictive environment refers to the least restrictive educational setting consistent with *that* student's needs, *not* the least restrictive setting that the school district chooses to make available." *T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 161 (2d Cir. 2014) (emphasis added and citation omitted).  "This requirement 'expresses a strong preference for children with disabilities to be educated, to the maximum extent appropriate, together with their non-disabled peers.'" *Id.* (quoting *Walczak v. Florida Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir. 1998)) (internal quotation marks omitted in original).

"Where the IEP is substantively deficient, parents may unilaterally reject it in favor of sending their child to private school and seek tuition reimbursement from the State." *T.K.*, 810 F.3d at 875.  A school district will be required to reimburse parents for expenditures made for a private school placement, if the services offered the student by the school district are inadequate or inappropriate.  *See Florence Cty. Sch. Dist. Four v. Carter By & Through Carter*, 510 U.S. 7, 13–16 (1993); *Sch. Comm. of the Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 369–70 (1985).  Following the *Burlington/Carter* test, once a court determines that a child

has been denied an appropriate educational opportunity by the public school district, the

remaining considerations are "whether the parents' private placement is appropriate to the child's

needs" and the balance of the equities. *C.F. ex rel. R.F. v. New York City Dep't of Educ.*, 746

F.3d 68, 73 (2d Cir. 2014).

"Generally, 'the same considerations and criteria that apply in determining whether the

School District's placement is appropriate should be considered in determining the

appropriateness of the parents' placement'; accordingly, the private placement must be

'reasonably calculated to enable the child to receive educational benefits.'" *Doe*, 790 F.3d at 451

(citation omitted). "Under New York law, 'the [school district] bears the burden of establishing

the validity of the IEP, while the parents bear the burden of establishing the appropriateness of

the private placement.'" *T.K.*, 810 F.3d at 875 (quoting *C.F.*, 746 F.3d at 76 (citing N.Y. Educ.

Law § 4404(1)(c))).[9]

## II.    Exhaustion Under the IDEA

When a plaintiff initiates an action that "seek[s] relief for the denial of a [free and

appropriate public education]," which is "the only 'relief' the IDEA makes 'available,'" plaintiff

must follow the IDEA's exhaustion procedures regardless of whether the action is filed "under

the ADA, the Rehabilitation Act, or similar laws[.]" *Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743,

752 (2017). "[I]n determining whether a suit indeed 'seeks' relief for such a denial, a court

should look to the substance, or gravamen, of the plaintiff's complaint." *Id.* "[I]f, in a suit

brought under a different statute, the remedy sought" is not covered by the IDEA, "then

exhaustion of the IDEA's procedures is not required." *Id.* at 754 ("After all, the plaintiff could

---

[9] "It remains an open question whether states may deviate from the IDEA's default rule, as New York does,
by placing the initial burden on the school board." *Reyes ex rel. R.P. v. N.Y. City Dep't of Educ.*, 760 F.3d 211, 219
(2d Cir. 2014) (citing *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 57–58 (2005)) ("the Supreme Court has
interpreted the statute to place the burden of challenging an IEP on the party bringing the challenge").

not get any relief from those procedures: A hearing officer, [lacking the power to order any relief], would have to send her away empty-handed.").

## DISCUSSION

Plaintiffs' claims can be categorized either as falling within the ambit of the IDEA, *i.e.,* seeking relief from the denial of a FAPE, or as claims seeking relief for other, potentially related, discrimination pursuant to the RA.  The Court first addresses the IDEA claims, as they represent most of the issues presented.

## I.     Standard of Review

In IDEA actions, district courts follow a procedure that is in substance an appeal from an administrative determination, not a traditional summary judgment analysis.  *See Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ.*, 397 F.3d 77, 83 n.3 (2d Cir. 2005).  Thus, the usual summary judgment considerations, of whether material factual disputes exist, are not employed; rather, the court "must engage in an independent review of the administrative record and make a determination based upon a preponderance of the evidence[.]"  *Hardison v. Bd. Of Educ. Of the Oneonta City Sch. Dist.*, 773 F.3d 372, 385–86 (2d Cir. 2014) (internal quotations and citations omitted).  That independent review, however, is not without significant limitations.  "The role of the federal courts in reviewing state education decisions under the IDEA is circumscribed."  *C.F.*, 746 F.3d at 77.   The standard of review "requires a more critical appraisal of the agency determination than clear-error review but nevertheless falls well short of complete *de novo* review."  *Id.* at 77 (quoting *M.H. v. New York City Dep't of Educ.*, 685 F.3d 217, 244 (2d Cir. 2012)).   The SRO has special expertise in educational matters involving the IDEA and its decisions, when "thorough and well-reasoned," are entitled to deference.  *T.Y. v. New York City Dep't of Educ.*, 584 F.3d 412, 419 (2d Cir. 2009).

17

Under this deferential review, "[w]here the IHO and SRO disagree," a federal court will "defer to the reasoned conclusions of the SRO as the final state administrative determination." *C.F.*, 746 F.3d at 77 (citation omitted). "However, where the SRO's determinations are insufficiently reasoned to merit deference," or when "considering an issue not reached by the SRO," the reviewing court "should defer to the IHO's analysis." *Id.* (citation omitted). "District courts are not to make subjective credibility assessments, and cannot choose between the views of conflicting experts on controversial issues of educational policy in direct contradiction of the opinions of state administrative officers who had heard the same evidence." *M.H.*, 685 F.3d at 240 (alterations and internal quotation marks omitted) (citing *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 383 (2d Cir. 2003)).

Different types of findings are also accorded different degrees of deference. The SRO's findings regarding the IEP's substantive adequacy command more deference than determinations regarding whether the IEP was developed according to proper IDEA procedures. *See M.H.*, 685 F.3d at 246; *see also M.P. v. Carmel Cent. Sch. Dist.*, No. 15 CV 3432 (VB), 2016 WL 379765, at *4 (S.D.N.Y. Jan. 29, 2016) ("Courts should afford more weight to SRO determinations when they involve the substantive adequacy of an IEP."). Determinations of appropriate methodology are accorded greater deference, while factual determinations of progress are afforded less. *See M.H.*, 685 F.3d at 246. Finally, more deference is due when this Court's determination rests solely on the same evidence presented to the SRO. *Id.*

It is with all these standards in mind, and having considered the parties' positions on deference,[10] that the Court approaches the findings, reasoning, and persuasiveness of the SRO's

---

[10] The parties dispute whether deference should be afforded. Plaintiffs argue no deference should be given because the IHO and SRO erred by relying on invalid or questionable test results and ignored Dr. Dietrich's opinion. (Pls. Mot. at 5–6.) Defendant argues that the administrative decisions should be afforded deference because the IHO

decision as to each of the issues below.

## II.     IDEA Claims

Plaintiffs seek review of the SRO's decision that denied them tuition reimbursements for

J.P.'s placement at WPS for portion of the 2015–2016 and for the 2016–2017 school years.

Under the *Burlington/Carter* test, "[t]he Court may require the school district reimburse

parents for their expenditures for private school educational services obtained for a student by the

parents, if (1) the services offered by the district were inappropriate, (2) the services selected by

the parent were appropriate, and (3) equitable considerations support the parent's claim." *E.S. ex*

*rel. B.S. v. Katonah-Lewisboro Sch. Dist.*, 742 F. Supp. 2d 417, 443 (S.D.N.Y. 2010), *aff'd*, 487

F. App'x 619 (2d Cir. 2012).

Prong one of the *Burlington/Carter* test involves both a procedural and substantive inquiry:

"(1) whether the student's IEP was developed according to the IDEA's procedural requirements,

and (2) whether the educational plan set forth in the IEP was reasonably calculated to confer

educational benefit on the student." *M.P.G. ex rel. J.P. v. New York City Dep't of Educ.*, No. 08

CIV.8051 TPG, 2010 WL 3398256, at *2 (S.D.N.Y. Aug. 27, 2010) (citing *Walczak*, 142 F.3d at

129); s*ee P.K. ex rel. S.K. v. New York City Dep't of Educ. (Region 4)*, 819 F. Supp. 2d 90, 105

(E.D.N.Y. 2011), *aff'd, appeal dismissed*, 526 Fed. App'x. 135 (2d Cir. 2013) ("A procedural

violation generally concerns the process by which the IEP and placement offer was developed and

conveyed; on the other hand, a substantive violation arises from a deficiency in the programming

being offered.").  "Under the IDEA, if a procedural violation is alleged, an administrative officer

may find that a student did not receive a FAPE only if the procedural inadequacies (a) impeded

---

and SRO engaged in well-reasoned, detailed analyses and that where IHO and SRO agree on certain issues even more
deference should be afforded.  (Def. Opp. at 6–7.)

the student's right to a FAPE, (b) significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE to the student, or (c) caused a deprivation of educational benefits." *M.P.G.*, 2010 WL 3398256, at *2 (citing 20 U.S.C. § 1415(f)(3)(E)(ii) and 34 C.F.R. § 300.513(a)(2)) (emphasis added).   In the event a court determines that the services offered by the school district were appropriate under the first prong of the *Burlington/Carter* test, it need not reach the second prong (appropriateness of parents' placement) and the third prong (equities).  *See Frank G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356, 364 (2d Cir. 2000).

Plaintiffs raise both procedural and substantive challenges to J.P.'s IEPs for the 2015–2016 and 2016–2017 school years.  As Plaintiffs initiated review of the SRO's decision, they bear the burden of persuasion as to the inappropriateness of the IEPs, as well as the appropriateness of J.P.'s placement at WPS during the 2015–2016 and 2016–2017 school years.  *See B.K. v. New York City Dep't of Educ.*, 12 F. Supp. 3d 343, 356–57 (E.D.N.Y. 2014) (citing *T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 252 (2d Cir. 2009)).

### A.  Compliance With IDEA's Procedural Requirements

Plaintiffs raise various procedural violations by the School District, including: (1) failure to answer Plaintiffs' Impartial Hearing Demand ("IHD"); (2) administration of invalid or questionable evaluative testing; (3) failure to fulfill the School District's child find obligations pursuant to 23 CFR § 300.111(c)(1); (4) failure to deliver timely IEPs; and (5) failure to address bullying concerns.  (Pls. Mot. at 6–12.)  The School District maintains that it complied with its procedural obligations under IDEA.  (Def. Opp. at 8.)  Each alleged procedural violation will be addressed in turn.

### 1.  *Answer To Plaintiffs' Impartial Hearing Demand*

Plaintiffs allege the School District never submitted an answer to their IHD filed on December 23, 2016.  (Pls. Mot. at 7; C.R. Ex. D-1.)  The relevant regulation outlines a school district's obligation to respond to a parent's complaint: "if the school district has not sent a prior written notice . . . to the parent regarding the subject matter in the parent's due process complaint notice, such school district shall, within 10 days of receiving the complaint, send to the parent a response . . . ."  8 NYCRR § 200.5(i)(4).  Plaintiffs argue that although the School District provided them with a Prior Written Notice concerning initial eligibility evaluations, such notice did not provide an answer that concerned the parents' concerns as described in their IHD.  (*Id.*)  Defendant avers that Plaintiffs' argument is irrelevant because "[t]here is no evidence that the School District did not provide the Plaintiff's [sic] with Prior Written Notices in lieu of an Answer to the Due Process complaint" and, even if there was, Plaintiffs failed to adequately seek remedy for such failure through a motion to dismiss at the IHO level or during the Impartial Hearing.  (Def. Opp. at 8 n.6.)

As an initial matter, the Court finds Defendant's arguments that Plaintiffs have waived this argument to be persuasive because the record does not appear to reflect that Plaintiffs have raised this issue at the IHO or the SRO level.[11]  Nevertheless, after careful consideration of the issue, the Court opines that the School District has failed to send a response regarding the subject matter of the parents' due process complaint notice within 10 days of receipt.  *See* 8 NYCRR § 200.5(i)(4).  The Prior Written Notice from the School District dated November 3, 2015 only addresses

---

[11]  Courts in this District appear to be split on the effect of an argument's waiver during the administrative proceedings.  *See N.S. v. New York City Dep't of Educ.*, No. 13-CV-7819 VEC, 2014 WL 2722967, at *7 n.13 (S.D.N.Y. June 16, 2014) (collecting cases).  Although this Court agrees that "permitting arguments to be advanced for the first time in the district court effectively eliminates the exhaustion requirement and undercuts the utility of an administrative process," the Second Circuit has yet to definitively decide on the issue.  *Id.*

conducting an evaluation to determine J.P.'s initial eligibility for special education services.  (C.R. Ex. D-17.)  This was only one of multiple subject matters raised in Plaintiffs' IHD.  Plaintiff's IHD complains of inappropriate IEPs that fail to offer a FAPE and child find violations.  (C.R. Ex. D-1.)  The regulation makes clear that the school district must respond if the school district "has not sent a prior written notice . . . *regarding the subject matter* in the parent's due process complaint notice."  8 NYCRR § 200.5(i)(4)(i) (emphasis added).  A school district's response to a parent's due process complaint is inadequate where it fails to address a portion of the claims advanced.  *See, e.g.*, *Jalloh ex rel. R.H. v. D.C.*, 535 F. Supp. 2d 13, 19 (D.D.C. 2008) (finding a response which was silent as to two of the four claims advanced in a parent's due process complaint to be inadequate).  Nothing in the record indicates that the School District has sent Plaintiffs a Prior Written Notice on the other subject matters raised or sent Plaintiffs an Answer to the IHD.  Accordingly, the Court finds that the School District has violated the IDEA's procedural requirement to respond to the IHD.  *See* 20 U.S.C. § 1415(c)(2)(B).

As other courts have noted, "the purpose of the response requirement seeks to guarantee meaningful parental participation in the student placement process."  *R.B. ex rel. A.B. v. Dep't of Educ. of City of New York*, No 10 CIV. 6684 RJS, 2011 WL 4375694, at *5 (S.D.N.Y. Sept. 16, 2011).  Thus, violations of the IDEA's procedural requirements are "actionable only if they affect a student's substantive rights."  *Id.*  Indeed, courts have noted that a school district's failure to respond adequately to a due process notice may not affect a student's substantive rights.  *See id.* (citing *Jalloh*, 535 F. Supp. 2d at 20).  Here, Plaintiffs have not offered any evidence that J.P.'s substantive rights were impacted by Defendant's procedural failure.  To the contrary, J.P.'s parents were able to meaningfully participate in the CSE meetings and at the five-day hearing before the IHO to address each of the issues raised in their due process complaint.  Accordingly, this IDEA

procedural violation is not actionable.

### 2. *Evaluative Testing*

Pursuant to 8 NYCRR § 200.4(b)(5) and (6), the School District must provide assessments or other evaluation materials of the student that "are valid and reliable." Plaintiffs allege the School District failed to provide appropriate evaluative testing for J.P. (Pls. Mot. at 8.) Specifically, Plaintiffs allege the WIAT-III testing completed in 2015 (C.R. Ex. D-7), the TORC testing completed in August 2016 (C.R. Ex. P-D), and the classroom benchmark evaluations of J.P. during fourth grade were all invalid and/or questionable. (*Id.*) Plaintiffs allege these were flawed testing and their results impacted the services offered, the ability of the School District to provide an appropriate IEP, and deprived the parents and CSE from making knowing decisions regarding the development of J.P.'s IEP. (*Id.*)

### a. *WIAT-III Testing*

Plaintiffs contend that the WIAT-III testing administered by the School District in 2015 was not valid. (Pls. Mot. at 8.) The record reflects that there were two administrations of the WIAT-III testing for J.P. in December of 2015. The first was administered by Plaintiffs' private evaluator, Dr. Jean Dietrich, sometime before December 22, 2015. (C.R. 512 (Dietrich).) The second administration was done by Nicole Gillespie, a learning specialist at PRES, on December 22, 2015. (C.R. 64 (Videla); C.R. Ex. D-7.) The record reflects that the CSE discussed how multiple administrations of the same exam in a short timeframe could affect the accuracy of test results for J.P. (C.R. Ex. P-A.) The record also reflects that both administrations of the tests were considered by the CSE, IHO, and SRO.

The SRO evaluated Plaintiffs' contention that the IHO based his decision on the School District's WIAT-III test erroneously because there were two administrations of the WIAT-III in

December 2015 which made the test results invalid.  (SRO Decision at 19.)  The SRO found this argument to be without merit because "a review of the hearing record indicate[d] that the two administrations were consistent with each other and provided sufficient information to aid the January 2016 CSE in determining the student's academic needs and to design and appropriate program by which to address those needs."  (*Id.* at 20.)

The Court finds no basis to disturb the SRO's conclusion.  Indeed, as the SRO noted, the record reflects the two evaluations showed generally consistent scores and ranges.  Corinne Videla, an elementary learning specialist, was asked during the hearing to compare the two WIAT-III evaluations.  Ms. Videla testified that any differences in the results of the examinations were "nominal" because "all of the ability levels are still within the same range."  (C.R. 73 (Videla).)  Ms. Videla noted the "only marked difference" in the written expression sub-test, which reflected an essay composition score of 99 in the administration by Ms. Gillespie and an 84 in the evaluation by Dr. Dietrich.  (*Id.*)  This was the only score that had a large enough variance to change the ability level.  (*Id.*)  Plaintiffs' witness Dr. Dietrich confirmed that the findings from her WIAT-III evaluation, which showed J.P.'s weakest scores in oral reading fluency and oral accuracy and rate, to be "identical in terms of that finding" when compared to the WIAT-III report from the School District.  (C.R. 511 (Dietrich).)  Because the two WIAT-III tests had consistent results, the Court finds that the two WIAT-III tests appropriately conveyed reliable information to the CSE in order to formulate an IEP for J.P.  Accordingly, any failure by the School District to provide an appropriate evaluative test did not cause a deprivation of educational benefits to J.P. and thus any procedural violation with respect to the 2015 WIAT-III testing is not actionable.

### b.  *TORC Testing*

Plaintiffs argue the TORC testing conducted by the School District in 2016 was

"questionable" and therefore provided test scores that were not reliable.  (Pls. Mot. at 8.)  The Diagnostic Learning Evaluation for J.P., dated August 4, 2016, shows that Ms. Videla administered the Woodcock Johnson and TORC-4 tests in July and August of 2016.  The TORC-4 evaluation is a silent reading comprehension test comprised of eight subtests.  (C.R. Ex. P-D at 5.)  J.P. scored an "average" to "below average" on the subtests, with an ability level of "very poor" on the relational vocabulary subtest.  (*Id.* at 5–6.)  When asked about the TORC-4 test results, Ms. Videla stated "the TORC definitely stood apart, and the results were questionable."  (C.R. 96 (Videla).)  However, she also explained the results were questionable because the format of the exam "in its visual presentation, can be overwhelming," particularly for J.P. who appears to have visual-motor weaknesses and that the visual aspect of the reading was "a daunting task for him."  (*See* C.R. 84, 96 (Videla).)

The SRO Decision did not address the adequacy of the TORC testing.  The Court finds that the TORC test results, although described by Ms. Videla as "questionable," do not arise to the level of a FAPE violation.  Notably, the School District did not rely solely on the TORC-4 test to formulate an IEP for J.P.  Instead, the CSE considered all the tests administered to formulate the IEP, including the two WIAT-III tests and the Woodcock Johnson test that provided consistent information about J.P.'s skills and needs. (*See* C.R. 96 (Videla) ("I found the Woodcock to be commensurate to the WIAT overall").)  Plaintiffs did not adequately "identify what harm was caused by the inclusion of these scores in the IEP."  *Y.N. v. Bd. Of Educ. of Harrison Cent. Sch. Dist.*, No. 17-CV-4356 (KMK), 2018 WL 4609117, at *17 (S.D.N.Y. Sept. 25, 2018).  Because the TORC-4 test did not appear to "impede[] the child's right to a FAPE," "significantly impede[] the parents' opportunity to participate in the decisionmaking process," or "cause[] a deprivation of educational benefits," there is no actionable procedural violation.  *R.E. v. New York City Dep't of*

*Educ.*, 694 F.3d 167, 190 (2d Cir. 2012).

### c.  Classroom Benchmark

Plaintiffs aver the classroom benchmark tests administered by the School District were invalid or questionable.  (Pls. Mot. at 8.)  This issue was not discussed by the SRO or IHO.  The record reflects the School District administered benchmark testing for reading in the fall of 2015. (C.R. Exs. D-21 to D-24.)  Plaintiffs do not identify what is invalid or questionable about classroom benchmark testing.  As a court in this district has stated, where plaintiffs do not allege, for example, that test scores were erroneously higher than they should have been and caused the IEP to recommend diminished educational support in that area, plaintiffs have not shown that inclusion of the scores in question are substantively inadequate.  *Y.N.*, 2018 WL 4609117, at *17.  Plaintiffs merely allege that the IHO, SRO, and CSE wrongly relied on the test results "all to JP's detriment," (Pls. Mot. at 8), without identifying how exactly the alleged invalid test scores affected the educational support given.

Because Plaintiffs fail to identify how the benchmark tests were flawed or how they deprived J.P. of educational benefits, the Court sees no basis to find that the School District failed to provide appropriate assessments.

### 3.  Child Find Obligations

Plaintiffs seek review of the SRO's finding that Plaintiffs failed to request relief for child find violations by the School District.  (Pls. Mot. at 11.)  Defendant maintains that there was no child find violation where the School District followed its established procedures and was proactive in providing assistance to J.P., including using the RTI program.  (Def. Opp. at 11.)

The IDEA creates a duty upon a local education agency to identify, locate, and evaluate "all children with disabilities . . . who are in need of special education and related services."  20

U.S.C. § 1412(a)(4)(A) (2000).  This "child find" obligation applies to "[c]hildren who are suspected of being a child with a disability . . . and in need of special education, even though they are advancing from grade to grade." 34 C.F.R. § 300.125(a)(2)(ii) (1999).  Thus, courts have held that child find duty is "triggered" when there is "reason to suspect a disability, and reason to suspect that special education services may be needed to address that disability."  *See J.S. v. Scarsdale Union Free Sch. Dist.*, 826 F. Supp. 2d 635, 660 (S.D.N.Y. 2011) (collecting cases).

Plaintiffs ask this Court to affirm the SRO's finding that the School District violated its child find obligation, but to reverse the SRO's finding that there was no relief requested for the violation and to award them for tutoring fees. (Pls. 56.1 at 22.)  J.P. received RTI services to assist with his reading in the second grade.   (C.R. Ex. P-P at 1; C.R. 318 (E.L.); C.R. 196 (Lichtenwalner).)  Also, during the second grade, Plaintiffs retained a tutor outside of school to assist with J.P.'s reading and literacy.  (C.R. 216–17 (E.L.).)  The SRO observed that the hearing record did not contain evidence regarding the School District's written RTI policy or any process monitoring data specific to J.P.'s progress in the RTI.  (SRO Decision at 12.)  The SRO found it "difficult to determine if the district was required to initiate a referral due to a lack of adequate process after an appropriate period of time when the student was provided instruction in the district's RTI program, [and] based on information in the hearing record suggesting [J.P.] fluctuated between Tier 1 and Tier 2 interventions." (*Id.* at 13.)  The SRO concluded the lack of evidence resulted in the School District's failure to establish that J.P. made adequate process pursuant to its RTI policy such that a referral to the CSE prior to October 2015 was not necessary. (*Id.*)

Further, the SRO found the School District violated its child find obligations "on the basis that the March 2014 private psychoeducational evaluation report forwarded to the district by the

parents was sufficient to provide reason to suspect a disability." (*Id.*) Plaintiffs obtained a private psychoeducational evaluation of J.P. by Dr. Anjali Roye in March 2014. (C.R. Ex. D-2.) This report was provided to the School District. (Def. 56.1 at 13.) The SRO's review of the March 2014 psychoeducational evaluation report revealed that the report provided reason for the School District to suspect that J.P. had a disability, and that special education may have been needed to address that disability. (*Id.*) Specifically, the SRO noted the March 2014 report identified deficits in J.P.'s processing speed, visual processing and automaticity related to letters, digits, and symbols, executive functioning, reading rate, accuracy, fluency, and fine motor dexterity and visual motor integration. (*Id.* (citing C.R. Ex. D-2).) The report recommended various modifications to J.P.'s educational program and "specifically recommended to the parents that they share the report with the CSE to determine if the student should be classified as a student with a learning disability." (*Id.*) The SRO concluded that this report provided a basis to suspect J.P. might have a disability and the School District was in violation of its child find obligation upon receipt of the report in the fall of 2014 up through the parents referring J.P. to the CSE in October 2015. (*Id.* at 13–14.)

The Court should defer to the SRO's reasoned conclusions on "matters requiring educational expertise." *W.A. v. Hendrick Hudson Cent. Sch. Dist.*, 927 F.3d 126, 145 (2d Cir. 2019) (quoting *R.E.*, 694 F. Supp. 3d at 189). The Court has also independently reviewed the record and finds that the SRO's ruling that the School District violated its child find obligations to be supported by a preponderance of the evidence. *See R.E. v. Brewster Cent. Sch. Dist.*, 180 F. Supp. 3d 262, 270 (S.D.N.Y. 2016) (deferring to SRO and IHO findings where violation was supposed by preponderance of the evidence). Indeed, the record indicates that there was a lack of data provided by the School District as to whether J.P. was progressing in the RTI program such that a referral to the CSE was not necessary. Furthermore, at the latest, the provision of Dr. Roye's

report to the PRES principal in the fall of 2014 unequivocally triggered the School District's child find obligation.  The report clearly stated that J.P.'s profile was consistent with a diagnosis of a Specific Learning Disability with impairments in reading and recommended the evaluation to be shared with the CSE to determine if J.P. qualifies as a student with a learning disability.  (C.R. Ex. D-2.)  At minimum, the School District's child find obligations were triggered in the fall of 2014 and it clearly violated such obligation by failing to refer J.P. to the CSE until the parents' referral in October of 2015.  The Court accordingly agrees with the SRO's finding that the School District violated its child find obligation.

The SRO found, however, that "no relief relevant to this violation ha[d] been requested" and that such violation did not impact the appropriateness of the program recommended by the January 2016 CSE.  (SRO Decision at 14.)  Plaintiffs seek an award of tutoring fees from September 2014 to January 2016 on the basis that E.L.'s testimony made clear the parents paid for tutors for J.P.  (Pls. Mot. at 11.)  This Court has reviewed the record and agrees that Plaintiffs never sought relief for tutoring expenses.  Furthermore, although reimbursement for private tutoring is available under the IDEA, *see E.W.K. ex rel. B.K. v. Bd. of Educ. of Chappaqua Cent. Sch. Dist.*, 884 F. Supp. 2d 39, 55 n.10 (S.D.N.Y. 2012), such reimbursement is only appropriate if the court finds that the school district denied FAPE to the student and that the private tutoring service is appropriate.  *See Michael P. v. Dep't of Educ.*, 656 F.3d 1057, 1069 (9th Cir. 2011); *see also* Lewis M. Wasserman, *Reimbursement to Parents of Tuition and Other Costs Under the Individuals with Disabilities Education Improvement Act of 2004*, 21 St. John's J. Legal Comment. 171, 227 (2006).  Accordingly, the issue of reimbursement will be discussed *infra*, after the Court examines the other prongs of the *Burlington/Carter* test.

29

### 4.  *Timeliness of IEPs*

Plaintiffs claim the School District failed to timely deliver any of the IEPs on or before the first day of school in violation of its IDEA procedural obligations.  (Pls. Mot. at 11.)  Defendant combats that this claim as inaccurate.  (Def. Opp. at 11–12.)

The Second Circuit has discussed there is no statutory provision or regulation that requires an IEP to be produced at the time parents demand but "[i]nstead, school districts must only ensure that a child's IEP is in effect by the beginning of the school year and that the parents are provided a copy."  *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 193 (2d Cir. 2015) (finding a school district "fulfilled its legal obligations by providing the IEP before the first day of school"); *see* 34 C.F.R. § 300.342(a) ("At the beginning of each school year, each public agency shall have an IEP in effect for each child with a disability within its jurisdiction.").  But, even when a school district failed to timely provide a copy of the IEP to the parents, a school district may nonetheless have fulfilled its IDEA procedural obligations where the parents had the "opportunity to participate in the decisionmaking process."  *N.K. v. New York City Dep't of Educ.*, 961 F. Supp. 2d 577, 586 (S.D.N.Y. 2013); *see Cerra*, 427 F.3d at 193 (holding the school district fulfilled its procedural obligations because the parents "had numerous opportunities to participate in meetings with respect to the identification, evaluation, and educational placement of the child").  The Court will examine whether Defendant fulfilled its procedural obligation with respect to the IEPs for the 2015–2016 and the 2016–2017 school years.

### a.  *IEP For The 2015–2016 School Year*

Plaintiffs claim the IEP for the 2015–2016 school year was untimely delivered in February 2016 "after years of seeking an IEP from the school district."  (Pls. Mot. at 11.)  The CSE meeting was held on January 14, 2016 to assess J.P. was entitled to special education learning.  (C.R. Ex.

D-9.)  Plaintiffs rejected the IEP by letter dated February 11, 2016.  (C.R. Ex. D-11.)  Plaintiffs claim they had been alerting the School District as to J.P.'s issues since 2013 and that an IEP should have been implemented as early as January of 2014 or, at minimum, as late as September 2014.  (Pls. Mot. at 12.)  Plaintiffs complain the School District took over half a year to initiate the IEP process from the time when E.L. spoke to the principal in September 2015, and nearly two years since the parents first informed them of Dr. Roye's report.  (Pls. 56.1 at 11.)  Defendant counters that Plaintiffs were timely presented with a copy of the IEP at the close of the January 2016 CSE meeting.  (Def. Opp. at 11.)

Neither the SRO nor the IHO decision addresses the timeliness of the IEP for J.P.'s 2015–2016 school year.  After careful consideration of the record, the Court finds that the School District did not untimely deliver this IEP.  Plaintiffs argue that the School District was on alert of J.P.'s issues and should have developed an IEP for him in 2014, prior to the start of the 2015–2016 school year.  (Pls. Mot. at 11; Pls. 56.1 at 11.)  These arguments are better suited for Plaintiffs' child find arguments rather than the timeliness of the IEP.  The record shows that Plaintiffs wrote to the School District's Interim Director of Special Education and submitted a formal request for J.P. be evaluated for special education eligibility and services on October 20, 2015.  (C.R. Ex. D-17; C.R. 327.)  On November 16, 2015, Plaintiff E.L. returned a consent for evaluations to be performed J.P. to determine whether he has a disability that may require special education services. (C.R. Ex. D-19).  The School District was able to complete evaluations of J.P. and held a CSE meeting on January 14, 2016, within two months after the consent form was returned.  Notably, J.P.'s parents did not formally request for J.P. to be evaluated until October 20, 2015, after the start of the school year.  The Court also finds the School District acted in a timely manner to provide Plaintiffs with the IEP after the CSE meeting held in January 2016.  Although the Court

31

is sympathetic to Plaintiffs' frustration that the School District should have referred J.P. to be evaluated back in 2014, these arguments are relevant for the child find obligation analysis, which the Court has already discussed *supra*.

Furthermore, courts have held that even if parents received an IEP after the first day of school, there is no denial of FAPE where the parents were able to meaningfully participate in the CSE meeting where the relevant program information was discussed.  *See, e.g.*, *GB v. New York City Dep't of Educ.*, 145 F. Supp. 3d 230, 246 (S.D.N.Y. 2015) (finding a delay in receiving an IEP did not deny a child a FAPE where no evidence suggested "the failure to provide the Parents with the IEP before the start of the school year in any way inhibited them from participating meaningfully in planning [the child]'s education"); *K.M. v. New York City Dep't of Educ.*, No. 13 Civ. 7719, 2015 WL 1442415, at *1 (S.D.N.Y. Mar. 30, 2015) (holding student was not denied a FAPE due to failure to provide parents with IEP until after first day of school where the parents participated in the CSE and received a draft IEP at the meeting).   Here, the record clearly shows that the parents were able to meaningfully participate in the January 14, 2016 CSE meeting.  (*See* C.R. Exs. P-A, D-9.)  Indeed, the Court listened to the January 14, 2016 CSE Meeting recording and noted J.P.'s parents were able to discuss J.P.'s issues, contribute to the CSE discussion of J.P.'s assessments, raise their objections regarding the WIAT-III testing, and participate in planning to assist J.P.  (*See* C.R. Ex. P-A.)  Accordingly, because J.P.'s parents were able to meaningfully participate in the CSE meeting, the Court declines to find that there is actionable procedural violation as to the School District's timeline for delivery of the IEP for J.P.'s 2015–2016 school year.

### b.  IEP For The 2016–2017 School Year

Plaintiffs claim the School District's handling of the IEP for J.P.'s 2016–2017 school year

was procedurally defective because the IEP should have been ready by September 2016 but instead was finalized in October 2016, after the school year had begun.  (Pls. Mot. at 12.)  Defendant avers there was no violation because the July 2016 IEP, which Plaintiffs rejected at the conclusion of the July 2016 CSE meeting, was in place at the beginning of the school year until after the October 2016 program review.  (Def. Opp. at 11–12.)

The SRO noted the record shows that there is no dispute that the CSE met in July 2016 and discussed the contents of J.P.'s IEP for the upcoming 2016–2017 school year, and that the School District sent the parents a copy of the completed July 2016 IEP in a letter dated August 30, 2016. (SRO Decision at 24.)  The SRO noted that during the July 2016 CSE meeting, the parents' counsel asked whether the IEP would be finalized after the CSE reconvened to consider updated testing, and the School District replied that the IEP developed at the July 2016 CSE meeting would be final because it might not be possible to complete the testing and reconvene prior to the beginning of the school year.  (*Id.* at 23.)  The record reflects that the first day of the 2016–2017 school year was on September 1, 2016.  (*Id.* at 24.)  By a September 21, 2016 letter, Plaintiffs informed the School District that the July 2016 IEP was received on September 3, 2016.  (*Id.*)  The SRO noted the case law is unclear as to whether the date of the mailing or date of receipt controls for purposes of when the School District provides an IEP to the parents.  (*Id.*)  Despite the lack of clarify as to whether the September 3, 2016 receipt of the IEP mailed on August 30, 2016 is a procedural violation, the SRO concluded that in any event any procedural error would not constitute a denial of FAPE "because the parents were aware of the program recommended by the July 2016 CSE and had already decided to reject it and unilaterally place the student at Winston, prior to the time the district was required to implement the IEP."  (*Id.*)

After due consideration, the Court finds that the SRO decision on this issue was thorough

and well-reasoned and should be given deference. *See T.Y.*, 584 F.3d at 419.  The Court agrees that case law does not illuminate whether provision of the IEP counts on the date of mailing or the date of receipt.  Nonetheless, the Court does not need to resolve this issue because the Court agrees with the SRO that there is no actionable violation even if the IEP was untimely provided.  There is no dispute that J.P.'s parents attended and participated at the CSE meeting in July 2016 to discuss development of an IEP for J.P.'s 2016–2017 school year.  (Pls. 56.1 ¶ 99; Def. 56.1 at 34.)  There is also no dispute that the parents rejected the IEP at the CSE meeting in July 2016.  (Pls. 56.1 ¶ 102; Def. 56.1 at 34–35.)  Where the parents were able to actively participate in the CSE meeting and were given "sufficient information to make a timely decision regarding the IEP," the alleged untimeliness of this IEP does not render the IEP legally inadequate. *See K.M.*, 2015 WL 1442415, at *13.  There is no evidence on the record that the Plaintiffs' receipt of the IEP on September 3, 2016, two days after the first day of school, had significantly impeded their opportunity to participate in the decision-making process or caused a deprivation of educational benefits to J.P. *See id.*  Accordingly, even if the School District provided the IEP in an untimely manner due to the late receipt by the parents, this procedural violation does not amount to an actionable IDEA violation.

### 5.  *Bullying*

The Second Circuit has stated "bullying can interfere with a disabled student's ability to receive a FAPE." *T.K.*, 810 F.3d at 876.  Thus, the Second Circuit has found a denial of FAPE when a school refused to discuss bullying during development of a student's IEP and resulted in a significant impediment to the parents' ability to assess the adequacy of an IEP. *See id.* (citing 20 U.S.C. § 1415(f)(3)(E)(ii)).  Plaintiffs aver the School District denied J.P. a FAPE because it did not adequately address the alleged bullying experienced by J.P.  (Pls. Mot. at 13.)  The School

District takes the position that there is no evidence that the alleged bullying affected J.P.'s ability to access his education and maintains that it has not failed any procedural obligations because Plaintiffs had a full and fair opportunity to participate in the formulation of IEPs.  (*See* Def. Opp. at 8.)

The IHO found Plaintiffs' representation of the bullying issue "not credible" and did not find the alleged incidents "in any way adversely affected J.P.'s ability to learn in the District program."  (IHO Decision at 23.)  The SRO declined to overturn the IHO's finding because the hearing record did not show J.P. developed any specific needs because of the alleged bullying.  (SRO Decision at 22.)  The SRO reviewed evidence of the alleged bullying incidents in January 2016 on a bus, in February 2016 during recess, and in a prior year involving threat of a BB gun.  (*Id.* (citing C.R. 201–06, 213–15, 348–49 and C.R. Ex. P-E).)  The SRO noted that the PRES principal investigated the two physical altercations in January and February 2016 and concluded those were "difficult peer interactions" that attributed to students making mistakes but did not amount to bullying.  (*Id.*)  The principal explained to E.L. that the latter incident involving a BB gun threat was investigated and there was no evidence that J.P. was targeted due to his learning disability.  (*Id.*)  Further, the SRO noted the parents did not raise bullying as a concern during any of the CSE meetings.  (*Id.*)  The SRO concluded the hearing record "does not support a finding that the student was denied a FAPE as a result of the alleged instances of bullying."  (*Id.*)

Where the IHO and SRO agree, the district court's deference to the administrative proceedings is heightened.  *See L.L. v. New York City Dep't of Educ.*, No. 15-CV-4146 (JPO), 2016 WL 4535037, at *5 (S.D.N.Y. Aug. 30, 2016) (being "mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy") (quoting *M.O.*, 793 F.3d at 243).  This Court therefore gives due

deference to the SRO's thorough and well-reasoned analysis, which upheld the IHO's finding. After careful review of the record and after listening to the entirety of the CSE meeting audio recordings, this Court agrees that the record does not support a finding that J.P. was denied a FAPE due to instances of bullying.  The record clearly indicates the principal of PRES investigated each of the alleged bullying incidences and concluded they did not rise to the level of bullying and had no connection to J.P.'s learning disabilities.  (C.R. 208–11 (Lichtenwalner).)  Unlike in *T.K.* where the parents "had reason to believe that the bullying would interfere with [the student]'s ability to receive meaningful educational benefits" and the school officials refused to discuss the bullying with the parents, here the record shows the PRES principal investigated and discussed the alleged bullying incidents with Plaintiffs and uncovered no evidence that the incidents were related to J.P.'s disability or affected J.P.'s ability to receive educational benefits.  *See* 810 F.3d at 876–77. Although Plaintiffs argue that the alleged bullying had an impact on their decision to privately place J.P., Plaintiffs admitted at the time they "don't know if [J.P.] is being bullied because of his learning disabilities" but only that they "suspect[ed] that may be the case."  (C.R. Ex. D-11 at 2.) Plaintiffs also did not raise these issues at the CSE meetings and did not show that these incidents interfered with J.P.'s ability to receive meaningful educational benefits.  Accordingly, this Court sees no evidence in support of a finding that there was a denial of FAPE on the basis of bullying, and affirms the SRO's finding.

### 6.  *Cumulative Procedural Violations*

"Multiple procedural violations may cumulatively result in the denial of a FAPE even if the violations considered individually do not."  *R.E.*, 694 F.3d at 190.  Here, the Court has identified two distinct procedural violations by the School District—(1) failure to answer Plaintiffs' impartial hearing demand and (2) failure to fulfill its child find obligations.  The Court

finds that, taken together, the cumulative effect of these violations does not amount to a substantive denial of a FAPE.  These procedural violations did not significantly impede Plaintiffs' opportunity to participate in the decisionmaking process regarding the provision of a FAPE.  To the contrary, J.P.'s parents participated in every CSE meeting and had unimpeded opportunity to participate in the development of his IEPs.  The Court also finds that the record does not support a finding that Defendant "displayed a pattern of indifference to the procedural requirements of the IDEA and carelessness in formulating [the] IEPs" so as to deprive J.P. of important educational benefits entitled by law.  *Y.N.*, 2018 WL 4609117, at *23 (citing *L.O. v. New York City Dep't of Educ.*, 822 F.3d 95, 124 (2d Cir. 2016)).  Accordingly, this Court declines to find that the School District's procedural violations cumulatively violated the IDEA.

### B.  Substantive Adequacy Of The IEPs

Having determined the violations of procedural safeguards did not deny J.P. a FAPE, the Court now turns to the substantive inquiry.  *See Y.A. v. New York City Dep't of Educ.*, No. 15-CV-05790 (CM), 2016 WL 5811843, at *7 (S.D.N.Y. Sept. 21, 2016).  A school district complies with IDEA's substantive requirements if a student's IEP is "reasonably calculated to enable the child to receive educational benefits."  *Id.* (quoting *Rowley*, 458 U.S. at 206–07).  Any substantive inadequacy in a student's IEP results in the denial of a FAPE.  *See M.W.*, 725 F.3d at 131 (quoting *R.E.*, 694 F.3d at 190).  An IEP is substantively adequate if it "provide[s] personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction."  *D.D-S v. Southold Union Free Sch. Dist.*, 09 Civ. 5026 (JS) (WDW), 2011 WL 3919040, at *11 (E.D.N.Y. Sept. 2, 2011) (quoting *Rowley*, 458 U.S. at 203), *aff'd*, 506 Fed. App'x 80 (2d Cir. 2012).  Questions of an IEP's substantive adequacy are ones in which "substantial deference is owed to the judgments of state administrative officers."  *Doe*, 790 F.3d at 450; *see also C.R. v.*

*New York City Dep't of Educ.*, 211 F. Supp. 3d 583, 609 (S.D.N.Y. 2016) (collecting cases).

Plaintiffs seek reversal of the SRO's finding that the School District provided FAPE to J.P. for the portion of the 2015–2016 school year and for the 2016–2017 school year. (Pls. 56.1 at 22.) Specifically, Plaintiffs argue that none of the IEPs provided were appropriate for J.P. (Pls. Mot. at 14–15, 18–19.) This Court will analyze the substantive adequacy of each IEP below.

### 1. IEP For The 2015–2016 School Year

Plaintiffs claim the January 2016 IEP developed for J.P.'s 2015–2016 school year was not substantively adequate. (Pls. Mot. at 14.) Defendant maintains the School District met its substantive obligations and urges the Court to adopt the SRO finding of the same. (Def. Opp. at 12–14.)

Both the IHO and SRO concluded the School District created an IEP for J.P.'s 2015–2016 school year that was appropriate to meet his educational needs. The IHO found the CSE crafted adequate goals and appropriate accommodations to address J.P.'s learning deficits in reading fluency, attention, and organization. (IHO Decision at 21–22.) The SRO found the hearing record supported the IHO's findings that J.P. was given a FAPE. (SRO Decision at 14.) The SRO thoroughly discussed the information evaluated by the CSE and concluded the IEP's recommendation for four 45-minute resource room services per week along with accommodations and modifications addressing his deficits were appropriate for J.P. (*Id.* at 14–21.) On the question of substantive adequacy, this Court gives substantial deference to the judgments of the state administrative officers. *See Doe*, 790 F.3d at 450. Having reviewed the record and the SRO's eight-page discussion on the January 2016 IEP (SRO Decision at 14–21), the Court agrees that the January 2016 IEP was substantively adequate.

As an initial matter, some of Plaintiffs' substantive challenges echo their procedural

challenges of this IEP.  Plaintiffs state "[b]ut for the failure of the district to evaluate in March of 2014 when there was no question that an IEP would be appropriate for JP, he would have had an IEP at the beginning of the 2015–2016 school year not in February of 2016."  (Pls. Mot. at 14.)  Plaintiffs repeat their procedural challenge that the IEP was untimely.  As discussed above, *supra* II.A.4, the Court finds no IDEA violation on this basis.  *See, e.g.*, *C.W.L.*, 149 F. Supp. 3d at 465 (analyzing assertion that IEP was not timely as a procedural challenge).  Plaintiffs also repeats their argument that this IEP was formulated upon flawed or questionable test results.  (Pls. Mot. at 14.)  As discussed, this Court finds the record shows the test results overall provided consistent information about J.P.'s profile to formulate an IEP and therefore finds no IDEA violation even if there was a procedural violation.  (*See supra* II.A.2.)

More importantly, the Court agrees with the SRO that the January 2016 IEP was reasonably calculated to J.P.'s needs.  The CSE convened at the request of J.P.'s parents on January 14, 2016.  (C.R. Ex. D-9.)  Among various issues, the CSE considered the parents' concerns regarding J.P., the private psychological evaluation by Dr. Dietrich, evaluations from the speech and occupational therapists, J.P.'s test scores and benchmarks, and J.P.'s prior progress in the RTI program.  (*Id.*; C.R. Ex. P-A.)  The Court gives substantial deference to the SRO's finding that the seven annual goals in the IEP were designed to address J.P.'s study, reading, writing, and mathematical skills, and the goals were commensurate with J.P.'s levels of performance.  (SRO Decision at 18.)  The Court agrees with the SRO that based upon these goals the CSE appropriately recommended four 45-minute sessions of resource room services per week, access to a word processor, additional time to complete assignments, classroom breaks, additional wait time for responses, check-ins for student's understanding, support for organization skills, refocusing and redirection, and modified homework assignments. (*Id.*; C.R. Ex. D-9.)   The district coordinator of elementary special

education, Toni Ann Carey, explained that the CSE first created the goals, and then "based upon the goals that were created, the level of service that was indicated was the level of resource room." (C.R. 449 (Carey).)  Carey recounted the School District determined that "[t]he co-teach model would be too restrictive and wouldn't necessary meet the needs that were identified in the goals of this IEP, yet consultant teacher didn't appear to be enough." (*Id.*)  Even Dr. Dietrich, Plaintiffs' private evaluator, confirmed the resource room four times a week at 45 minutes a day would help J.P.  (C.R. 516 (Dietrich).)  The IDEA requires a school district to provide a FAPE in the "least restrictive environment." 20 U.S.C. § 1412(a)(5).  The Second Circuit has stated that a district court should apply a two-pronged approach to determine whether an IEP placed a student in the least restrictive environment: (1) "whether education in the regular classroom, with the use of supplemental aids and services, can be achieved satisfactorily for a given child," and (2) "if not, then whether the school has mainstreamed the child to the maximum extent appropriate." *P. ex rel. Mr. & Mrs. P. v. Newington Bd. of Ed.*, 546 F.3d 111, 119 (2d Cir. 2008).  Based on the Court's review of the record, the Court finds that this IEP was reasonably calculated to meet J.P.'s needs without being overly restrictive.

Plaintiffs argue that the IEP is not appropriate because J.P. was regressing at PRES and there was no evidence of any improvement while the IEP was being implemented.  (Pls. Mot. at 14.) The SRO considered this issue but concluded the record lacks evidence to make this determination.  (SRO Decision at 20.)  This Court agrees with the SRO.  There lacks evidence in the record to support Plaintiffs' position.  Notably, J.P. remained at PRES for only short time while the IEP was implemented.  The record indicates the IEP was to be implemented on January 26, 2016.  (C.R. Ex. D-9 at 3.)  J.P. was placed in the resource room and then later taken out when E.L. noted this was done without parental permission.  (C.R. 345 (E.L.).)  E.L. testified that J.P.

was placed in the resource room for about six weeks but that she "didn't notice any great difference at home." (C.R. 346 (E.L.).)  But E.L. also testified they received a "glowing report" from J.P.'s teacher, Mrs. Crupi, and a similar report from Ms. Gillespie, who teaches the resource room.  (*Id.*) By February 11, 2016, E.L. had written the School District informing of their decision to unilaterally place J.P. at WPS beginning on March 7, 2016.  (C.R. Ex. D-11.)  The record is lacking in evidence that J.P. was regressing the short time he was at PRES.

Based on its independent review of the record, and with substantial deference given to the SRO's findings, this Court concludes that the preponderance of the evidence does not support a finding that the January 2016 was substantively inadequate.  Accordingly, the Court concludes that no FAPE was denied for the 2015–2016 school year.

### 2.  IEPs For The 2016–2017 School Year

The CSE convened in July 2016 and October 2016 to develop IEPs to address J.P.'s needs for the 2016–2017 school year.  (C.R. Exs. D-13 & D-16.)  Plaintiffs claim these IEPs were not appropriate for J.P. "[l]argely for the same reasons as the year before." (Pls. Mot. at 18.)  Plaintiffs again raise the issues of the untimeliness of the IEPs and its reliance upon alleged flawed or questionable testing.  (*Id.*)  Plaintiffs also aver the IEPs for the 2016–2017 school year did not differ much from the IEP developed for the 2015–2016 school year, except for an extra day of resource room.  (*Id.*)  Plaintiffs argue the IEPs are substantively inadequate because the CSE failed to appreciate the progress at the private school attained by J.P.  (*Id.* at 18–19.)  Defendant maintains the CSE designed IEPs that were unique to J.P.'s educational needs.  (Def. Mot. at 14.)

The IHO determined that the July 2016 and October 2016 IEPs were appropriate.  (IHO Decision at 24–25.)  The SRO declined to disturb the IHO's finding.  (SRO Decision at 28.)  The SRO determined the record does not reflect J.P.'s needs had changed significantly after the January

216 CSE meeting, based on the new evaluative information discussed at the July 2016 and October 2016 CSE meetings. (*Id.* at 26.) The Court reviews the record with substantial deference given to the SRO determination of the substantive adequacy of the IEPs. *See M.P.*, 2016 WL 379765, at *4.

The record reflects that the CSE convened on July 28, 2016 to conduct an annual review of J.P., who had been privately placed at WPS since March 2016. (C.R. Ex. D-13.) The dean and J.P.'s focus teacher from WPS joined the CSE meeting telephonically. (*Id.*; C.R. Ex. P-B.) During the meeting, WPS discussed J.P.'s progress at the school and noted that his awareness had noticeably increased as he has started asking for clarification on assignments and learned to monitor his own progress. (C.R. Ex. P-B.) WPS also reported on updated testing. (*Id.*) The CSE evaluated prior evaluations along with WPS's reports and updated academic information. (C.R. Ex. D-13.) Based on its review, the CSE recommended daily resource room services for 45 minutes a day, monthly counseling consult to help with J.P.'s social emotional needs, an occupational therapy monthly consult for J.P. for the 2016–2017 school year. (*Id.*) Additionally, the CSE requested parental consent for updated academic testing. (*See id.*) Notably, the July 2016 IEP includes many references to the reporting from WPS representatives. The Court finds that Plaintiffs' claim that the CSE did not appreciate J.P.'s progress at WPS to be meritless. To the contrary, and as the SRO concluded, the CSE appropriately modified J.P.'s annual goals based on the information provided by WPS and recommended an increase in resource room, while still offering a least restrictive environment for J.P.'s educational needs.

The CSE reconvened on October 13, 2016 to review the updated academic testing. (C.R. Ex. D-16.) WPS representatives was also in attendance by teleconference. (*Id.*; C.R. Ex. P-C.) The Woodcock Johnson III and the TORC-4 were administered in August 2016. (C.R. Ex. D-16.)

J.P.'s scores were below average in sentence completion and scores were lower in executive function.  (*Id.*)  He performed well on the Woodcock Johnson and scored highly in paragraph completion.  (*Id.*)  During the October meeting, WPS reported how J.P. had been progressing. WPS noted J.P. recently broke his leg but was resilient, and that he met with his focus teacher at WPS for 45 minutes every day to assist with his stamina and to develop his self-monitoring strategies.  (C.R. Ex. P-C.)  "As a result of testing[,] new goals will be added" to the IEP.  (*Id.* at 1.)  Specifically, the October 2016 IEP added a goal to address J.P.'s reading needs identified in the updated testing.  (*Compare* C.R. Ex. D-13 at 7–8 *with* C.R. Ex. D-16 at 9.)  During the CSE meeting, the School District remarked that other than updating the writing goals, "the goals we put together for [J.P.] clearly still match his needs."  (C.R. Ex. P-B at 11:44.)  The School District also addressed Plaintiffs' concern that 45 minutes of resource room is insufficient to address J.P.'s needs.  (*Id.* at 18:50.)  In this discussion, the PRES resource room teacher discussed how J.P.'s abilities exceeded those of other students in the resource room and opined that an IEP recommendation beyond a resource room package would set J.P. back.  (*Id.*)  After careful consideration, this Court agrees with the SRO that the October 2016 IEP was appropriately developed to meet J.P.'s needs after the CSE considered the improvement J.P. showed at WPS. The record is clear that the CSE specifically discussed and evaluated the progress attained by J.P., including evaluating the information shared by WPS at the meetings.  Contrary to Plaintiffs' view, the Court finds that the CSE did not ignore J.P.'s progress but, instead, modified the IEP goals and recommendation appropriately in light of his progress.  Accordingly, the Court concludes the School District offered an IEP that was "reasonably calculated" to enable J.P. to make progress "in light of the child's circumstances."  *Andrew F.*, 137 S. Ct. at 998–1001.

Therefore, this Court affirms the SRO's finding that the July 2016 and October 2016 IEPs

for J.P.'s 2016–2017 school years were substantively adequate and properly offered J.P. a FAPE.

### C. J.P. Was Not Denied A FAPE

The Court finds that the SRO correctly determined that the School District provided J.P. a FAPE for the 2015–2016 and 2016–2017 school years. Accordingly, the Court need not decide whether his unilateral placement at WPS was appropriate, or whether equitable considerations favor Plaintiffs' request for tuition reimbursement. *See M.C. ex rel. Mrs. C. v. Voluntown Bd. Of Educ.*, 226 F.3d 60, 66 (2d Cir. 2000) ("If the challenged IEP was adequate, the state has satisfied its obligations under the IDEA and the necessary inquiry is at an end."). Because J.P. was not denied a FAPE for either school year, Plaintiffs' request for tuition and tutoring reimbursement is DENIED. *See J.S.*, 826 F. Supp. 2d at 658 ("no reimbursement is permissible" where the court finds the state complied with IDEA procedures and the IEP was reasonably calculated to enable the child to receive educational benefits) (citing *Cerra*, 427 F.3d at 192).

### III.   Rehabilitation Act

Plaintiffs seek reversal of the IHO's denial of their claims under Section 504 of the Rehabilitation Act. (Pls. Mot. at 24–25.) Section 504 provides that "no otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subject to discrimination under any program or activity receiving federal assistance." 29 U.S.C. § 794. To state a claim under Section 504, a plaintiff must allege (1) "that he or she is a person with disabilities under the Rehabilitation Act," (2) "who has been denied benefits of or excluded from participating in a federally funded program or special service," (3) "solely because of his or her disability." *Bryant v. New York State Educ. Dep't*, 692 F.3d 202, 216 (2d Cir. 2012). Moreover, "something more than a mere violation of the IDEA is necessary in order to show a violation of Section 504 in the context of educating children

with disabilities, i.e., a plaintiff must show that a school district acted with bad faith or gross misjudgment." *Y.D. v. New York City Dep't of Educ.*, No. 14C1137-LTS, 2016 WL 698139, at *6 (S.D.N.Y. Feb. 19, 2016).

The IHO found no Section 504 violations by the School District after finding "absolutely no evidence that JP was excluded from participation in programming or denied the benefits of or subject to discrimination on the basis of his disability." (IHO Decision at 27.)  The IHO also found the School District's RTI approach prior to referral to CSE to be "a good faith educational methodology not a discrimination ploy." (*Id.*)  After review of the record, this Court agrees.

First, Plaintiffs argue that there was a Section 504 violation because there was a child find violation. (Pls Mot. at 24.)  As discussed *supra* II.A.3, this Court finds the School District violated its child find obligation under IDEA by failing to refer J.P. to be evaluated by the CSE in the fall of 2014 when Plaintiffs shared Dr. Roye's report with the PRES principal.  However, Plaintiffs have not shown that the School District violated its obligation "with bad faith or gross misjudgment." *Y.D.*, 2016 WL 698139, at *6.  It is undisputed that J.P. first received Tier 1 interventions under the RTI program in the second grade, and briefly received Tier 2 interventions before going back to Tier 1 interventions in reading fluency in the third grade.  With the RTI efforts in mind, this Court concludes the School District was not purposefully trying to deny J.P. a FAPE, but in good faith were following their RTI program in place to assist J.P.  Plaintiffs have not pointed to any evidence that shows the School District acted with bad faith or gross misjudgment in its child find violation.  Second, Plaintiffs allege there was a Section 504 violation because the School District thought the alleged bullying experienced by J.P. was not serious enough to warrant action. (Pls. Mot. at 24.)  However, as discussed *supra*, the record does not support a finding that J.P. was bullied due to his disability or that the peer-to-peer incidences investigated by the PRES

principal prevented J.P. from receiving his educational benefits.  Accordingly, the Court finds that

the record does not support a finding of an actionable Section 504 claim.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment is DENIED.  The

Clerk of Court is respectfully directed to terminate this action.


Dated:    August 25, 2022                              SO ORDERED:
          White Plains, New York

_____
                                              NELSON S. ROMÁN
                                           United States District Judge